UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| IN RE: | . | Case No. 3-20-10422-CJF |
| | . | Chapter 11 |
| | . | |
| CCC LOT 2, LLC, | . | 120 N. Henry Street, Room 340 |
| | . | Madison, WI 53703 |
| Debtor. | . | |
| | . | Friday, July 10, 2020 |
| . . . . . . . . . . . . . . . | . | 2:00 p.m. |

TRANSCRIPT OF MOTION TO DISMISS CASE [27]
**BEFORE THE HONORABLE CATHERINE J. FURAY**
**UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Kerkman & Dunn<br>By: JEROME R. KERKMAN, ESQ.<br>839 N. Jefferson Street, Suite 400<br>Milwaukee, WI 53202<br>(414) 277-8200 |
| For Alliant Credit Union: | Reinhart Boerner Van Deuren, S.C.<br>By: FRANK W. DICASTRI, ESQ.<br>1000 North Water Street, Suite 1700<br>Milwaukee, WI 53202<br>(414) 298-8356 |

TELEPHONIC APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Courtroom Personnel |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46038<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):

| | |
|---|---|
| For the United States Trustee: | Office of the United States Trustee<br>By: JENNIFER K. NIEMEIER, ESQ.<br>780 Regent Street, Suite 304<br>Madison, WI 53715<br>(608) 264-5522 |
| For Claire Hawthorn: | Cade Law Group, LLC<br>By: NATE CADE, ESQ.<br>P.O. Box 170887<br>Milwaukee, WI 53217<br>(414) 255-3802 |

(Proceedings commence)

THE CLERK: All rise.

THE COURT: Please be seated. All right. We're back on the record in the matter of CCC Lot 2, LLC, Case Number 20-10422.

Would you state your appearances for the record for this afternoon?

MR. KERKMAN: Good afternoon, Your Honor. Jerome Kerkman for the debtor, CCC Lot 2. Also on the phone is Mr. Eisenga.

MR. DICASTRI: And good afternoon, Your Honor. Frank DiCastri on behalf of Alliant Credit Union.

THE COURT: Are there any other --

MS. NIEMEIER: Good afternoon, Your Honor.

THE COURT: I'm sorry. Go ahead, Ms. Niemeier.

MS. NIEMEIER: Yeah. Jennifer Niemeier appears on behalf of the United States Trustee.

MR. CADE: Attorney Nate Cade appears on behalf of third party Claire Hawthorne, Your Honor.

THE COURT: Thank you. Any other appearances? If not, the Court appreciates the understanding of the parties to push this back a little bit so that the Court could be fully prepared to render its decision. The following will constitute the findings of fact, conclusions of law and decision of the Court in this matter.

The matter before the Court is the motion to dismiss filed by Alliant Credit Union -- and I will refer to them as Alliant from this point forward this afternoon -- in the matter of CCC Lot 2, LLC, which I will refer to either as CCC or debtor.

CCC is a limited liability company with its principal place of business in Columbus, Wisconsin. It is a single-asset real estate case.

Alliant is a secured creditor with a first priority security interest in and liens or mortgages upon effectively all of CCC's assets consisting principally of a vacant retail grocery store building and land upon which it sits and, of course, including all rents, income, profits, revenues generated by the property as well as miscellaneous furniture, fixtures and equipment which can be referred to as FF&E. In other words, as noted, all of the assets of the debtor.

On March the 3rd, 2017, Alliant loaned CCC the sum of $6,975,000. The purpose of the loan was to refinance a construction loan for the grocery store property, which I will refer to simply as the property. The loan was accepted and agreed to by CCC's principal, Michael Eisenga, who I will refer to hereafter as Eisenga, through First American Properties, LLC, which I will call First American. Eisenga is also the principal and sole member of First American. Eisenga also executed a personal guaranty of the obligations of CCC to

Alliant.

Two days prior to the loan's approval, Eisenga informed Alliant that he had secured a 20-year lease for the property with Festival Foods. I'll call this the Festival lease. The Festival lease was guaranteed, according to Mr. Eisenga, by SUPERVALU Holdings, Inc. I will call them SUPERVALU. The Festival lease was dated April 1, 2015, and bears signatures appearing to be those of Eisenga and Michael Clark (phonetic), a purported assistant vice president of Festival. The SUPERVALU guaranty was also dated April 1, 2015, and appears to bear the signature of a Barbara Parks, the purported associate counsel of SUPERVALU.

The purported lease and SUPERVALU guaranty were material facts inducing Alliant to approve the loan. Eisenga was the person who provided the Festival lease and related guaranty to Alliant either directly or through his mortgage broker -- CCC's mortgage broker.

In November or December of 2018, Eisenga advised Alliant that CCC was unable to pay its obligations to Alliant. Thereafter, Alliant began an investigation with respect to the purported lease and guaranty. Alliant became aware of possible fraudulent steps taken by Eisenga to obtain the CCC loan, specifically that Eisenga forged the Festival lease and guaranty used to induce Alliant to make the loan.

Eisenga, through one of his entities, opened a market

and hardware store in the property in 2015, branding it Sentry/ACE.

On March the 12th, 2020, Eisenga appeared with counsel at the Section 341 meeting of creditors in both his individual and the CCC bankruptcy cases. When confronted with the Festival lease and the SUPERVALU guaranty, Eisenga refused to answer all subsequent questions based on his acknowledged rights under the fifth amendment. Based on the assertion of fifth amendment rights with respect to questions thereafter asked, the Court is entitled to make certain adverse inferences. The Court will make the following inferences.

That Eisenga signed the Festival lease. That, in fact, there was never a lease with Festival Foods in 2017 -- 2015. That Eisenga forged or caused to be forged the signature on Page 8 of the Festival Lease that purports to be from Michael Clark of Festival Foods.

That CCC never had a guaranty of the lease from SUPERVALU. The SUPERVALU guaranty was a forgery. That Eisenga forged or caused to be forged the signature of Barbara Parks on the SUPERVALU guaranty.

That the SNDA associated with all of this contained false representations with respect to the Festival lease. That the tenant estoppel certificate also contained false representations with respect to the Festival lease.

That the loan obtained by CCC from Alliant was based

on false representations that there was, in fact, a 20-year lease with Festival Foods and a guaranty from SUPERVALU. That Eisenga knew and expected that Alliant would rely on the Festival lease and SUPERVALU guaranty in extending the loan to CCC. That Eisenga or one of his companies had an employee at one point in time with the name Michael Clark.

That Eisenga knowingly and intentionally acted to defraud Alliant so that CCC could obtain a loan from Alliant to refinance the construction loan. That as the sole owner of the sole owner of the debtor -- in other words, that as the owner -- the sole owner of First American who is the sole owner of the debtor, Eisenga personally benefitted from the loan by Alliant to the debtor. That Eisenga knew that Alliant would not have loaned approximately $7 million to CCC without the false representations associated with the Festival lease and the guaranty.

CCC has not paid Alliant principal or interest on the loan since approximately November 2018. In May of 2019, a state court action was commenced seeking a foreclosure, asserting fraud claims and seeking determination of amounts owed on -- by CCC and under the guaranty.

On July the 12th, 2019, the state court entered findings of fact, conclusions of law and order for money judgment in favor of Alliant on its foreclosure and fraud claims. Specifically, in those findings of fact, conclusions

of law and order, Judge Voight found that Eisenga and CCC induced Alliant to make the loan through representations regarding the Festival lease and SUPERVALU guaranty which were, quote, "untrue, false and made with intent to deceive and defraud," closed quote. Judge Voight also found that a representative of Eisenga's admitted to Festival -- admitted to the fact that the Festival lease was, quote, "bogus," closed quote and a, quote, "dummy lease," closed quote. Judge Voight concluded that CCC and Eisenga intentionally deceived and defrauded Alliant and found them jointly and severally liable for their collective indiscretions.

Three days later, a judgment of foreclosure was entered. The judgment determined that, at the time, there was $6,892,093.37 owed to Alliant with interest accruing at 4.375 percent per annum. Excuse me.

Judge Voight further ordered that the property be sold. Eisenga and CCC were given a three-month redemption period, and the property was to be sold at sheriff's sale in Columbia County in the event it was not redeemed. The property was, in fact, sold at a sheriff's sale on October 21, 2019. The highest and only bid at the time was $2.2 million, and the bidder was Alliant.

There was a motion to confirm the sale which was opposed by Eisenga who filed a competing as-is appraisal with a $4 million valuation. That valuation was prepared by Mr. Gary

DeClark of Valbridge.

A hearing on the motion to confirm the sale was scheduled for February 11, 2020. However, the hearing did not take place because of the filing of this Chapter 11.

A state court receiver had been appointed, and the property has remained in the possession of that state court appointed receiver, and all expenses incurred have been funded or advanced by Alliant. The property has been vacant since May 2019, and it remains vacant.

Mr. DeClark prepared a revised valuation of the property in connection with the motion before this Court. The revised valuation increased both the as-is valuation, in his opinion, and the valuation of what he described as the highest and best use value. It included various assumptions in increasing the estimated highest and best use value to $6.9 million, and those assumptions, based on Mr. DeClark's testimony, were assumptions, although the valuation was in May of 2020, based on the conditions that existed at what Mr. DeClark acknowledged were the pinnacle of the real estate market.

Those factors at the pinnacle were that the Dow Jones was up. Interest rates were down. The economy was great. Freestanding grocery stores were sought after, and there was low unemployment.

Mr. DeClark further based his opinions on information

from either the debtor, Mr. Eisenga, or someone named Wick (phonetic). Who or what Mr. Wick is and the source or basis of his information was never disclosed. There was no indication that Mr. Wick is a person or his company is an entity that is regularly and routinely relied upon by experts in the field of valuation.

Mr. DeClark requested historic data. It was never presented. He made certain assumptions about historic data.

He requested information about past tenants. He was provided information without knowing that those -- that at least one or two of those past tenants were, in fact, entities that had common ownership with the debtor. He relied principally in increasing his valuation on three sales of substantially larger properties located in Wales, Oconomowoc and Milwaukee, two of which happened to be branded by very recognized branding names. Those, he conceded, had a substantial impact on his selection of comparables and on valuation.

In addition, those are not only in more urban areas but are larger and different sorts of properties. He assumed for the purpose of his higher valuation that within six months, a tenant could be located who would be willing to pay pre-COVID, pinnacle of the market rental rates. But he also acknowledged that such a tenant would be likely to want to negotiate at least up to two years of occupancy in an initial

lease term paying no rent but paying taxes, utilities and associated costs.

Eisenga seeks the highest valuation on behalf of CCC for the property for the sole purpose of reducing his liability under his personal guaranty. He also sought the lowest possible value in connection with a divorce proceeding as indicated in his testimony related to his assets.

Assuming the Alliant debt was $7.2 million, which appears to be the outstanding indebtedness as of the petition date, and if the highest possible value asserted by Mr. DeClark were to be believed at $6.9 million, the deficiency together with the disputed indebtedness to the sole other creditor in this case would be $460,000. Eisenga testified that First American could fund $3,000 per month and, if so, at 3.75 percent interest, that in slightly less than 20 years, a $460,000 deficiency plus the amount owed to the only other creditor could be paid.

However, there is no evidence in the record of any ability to fund even 1 -- a $1 million shortfall or any larger shortfall. Simple math calculations would indicate, for example, that if at 3.75 percent there was to be a payment on a million dollars, $3,000 per month would be insufficient to even service the interest.

Mr. Eisenga's testimony regarding values, his ability to fund a plan through First American or himself and the

purposes of the Chapter 11, based on his testimony, are unreliable, not credible and clearly demonstrate that his positions are, at best, malleable and intended solely for the purpose of his personal benefit.

I will not, for the most part, repeat those findings as I continue. They are, however, bases for the Court's conclusions.

Section 1112(b) of the Bankruptcy Code provides for the conversion or dismissal of a Chapter 11 case on a motion of a party in interest. Before 2005, conversion or dismissal under the Code was a matter left mostly to the courts' discretion. However, as noted in the Aurora Memory Care case from the Northern District of Illinois, since 2005, the discretion has been a bit curtailed. Conversion or dismissal is now mandatory if the movant meets its burden of proof.

Under Section 1112(b)(1), the Court must convert a case to Chapter 7 or dismiss if cause to do so is demonstrated. Cause is defined in Section 1112(b)(4) with a list of examples. That list is not exclusive as noted in the Tekana (phonetic) case out of the Northern District of Illinois.

However, conversion or dismissal may be disallowed if a debtor successfully and specifically identifies what are known as unusual factors that describe conversion -- that establish conversion or dismissal is not in the best interest of creditors and the estate. The term "unusual circumstances"

is not defined in the statute. Case law such as In Re Dovetail, Inc. indicates that the phrase contemplates conditions that are not common in Chapter 11 cases.

As noted in Gateway, the focus is on the best interest of creditors and the estate. As such, courts have wide discretion to determine whether the circumstances are sufficiently unusual enough to prevent conversion or dismissal in the face of established cause. Thus, inquiry into facts is necessary and may be intensive.

Pause at this end while I'm mopping up my coffee. Thanks.

(Pause)

THE COURT: If cause is established and unusual circumstances are not found by the Court, conversion or dismissal is required unless the Court determines that the appointment of a trustee or an examiner under Section 1104(a) is in the best interest of the estate and the creditors. Thus, the focus continues to be best interest of the estate and creditors.

Pursuant to Section 1112(b)(1), the initial burden lies, in this instance, on Alliant to establish cause for dismissal. This requires establishment of cause by a preponderance of the evidence as noted by the Woodbrook Associates court. If cause is established, then the burden shifts, in this case, to the debtor to prove it falls within

the 1112(b)(2) unusual circumstances exception to 1112(b)(1)'s mandatory conversion or dismissal.

As noted in the Aurora Memory Care case, this exception applies only if the debtor can demonstrate, one, that a plan is reasonably likely to be confirmed within the statutorily required time, and two, that debtor had reasonable justification for the act or omission constituting cause for conversion or dismissal and the act or omission will be cured within a reasonable period of time.

Here, I note, as previously indicated, there are only two creditors: Alliant and the disputed claim of SUPERVALU. Thus, it is claims of those two creditors that are the focus of the first part of the standard, which is the best interest of the creditors.

As described, the examples list of cause under 1112(b)(4) is not exclusive. The Seventh Circuit has provided some guidance going back in time to the Jartran case. As the Seventh Circuit explained in that case, although Section 1112(b) does not explicitly provide that the lack of good faith may constitute cause, Section 1129(a)(3) does require that plans be proposed in good faith. Courts have sensibly considered bad faith to be an acceptable basis for conversion or dismissal.

Further, as noted by the Madison Hotel Associates case out of the Seventh Circuit, good cause is recognized as a

prerequisite for eligibility to file a Chapter 11 case, and lack of good faith may constitute cause for dismissal of a case under 1112(b). In determining whether cause exists to dismiss a Chapter 11 case for a bad faith filing, courts may consider the number of unsecured creditors, improper prepetition conduct, whether there are few debts to nonmoving creditors, the timing of the petition with respect to state court foreclosure actions, whether the foreclosed property is the sole or major asset of the debtor, the possibility of reorganization and whether the debtor filed bankruptcy solely to create the automatic stay. Courts generally consider the totality of the circumstances in determining whether there is cause for dismissal under 1112(b).

I find that Alliant has met its burden to establish cause for dismissal by a preponderance of the evidence. Eisenga and CCC engaged in fraudulent acts prior to CCC's bankruptcy filing. There is only one other creditor in this case whose claim in comparison to that of Alliant is de minimis.

Allowing this case to continue would, in many respects, only serve to further that fraud, because it is apparent that the sole purpose of this filing is, in fact, to benefit Eisenga by reducing his personal liability under his guaranty. To accomplish this, he proposes to stretch payments to the sole two creditors in the case over an extended period

of time. Whether that extended period of time is the 20 years contained in the current plan before the Court or in some lesser period of time, there's no evidence of the stability of payments and the availability of funds over a 20-year period or of funds that would be sufficient to pay all of those debts in full.

Further, I take into account that the $6.9 million is not a realistic, credible or reliable value and is clearly inflated. At best, I find that the reasonable value of the property is $4.4 million at the present time under the facts and circumstances.

I take into account that this is a single-asset real estate case, but it is not a single-asset real estate case where the debtor is proposing, for example, a 363 sale with an arm's length buyer. Nor is it a case where the debtor is proposing to restructure, reamortize and continue the actual conduct of business with the single asset. There is no cash flow that would support that at present.

Instead, that asset is to be surrendered. So there would be, in fact, for the current debtor, no actual business to reorganize or to conduct. And there's no testimony that would suggest anything to the contrary. Then, we would be left with dollar amounts to be paid to the two creditors on a deficiency and on a disputed claim over a period of time, principally for the benefit of reducing the amount of

Mr. Eisenga's personal guaranty.

CCC does not deny the fraud allegations. Rather, it asserts that any fraud that has occurred has already happened, and there's no allegation of current or ongoing fraud by CCC with -- or any other party. It argues that improper prepetition conduct is not, per se, bad faith when a debtor has a valid reorganization purpose.

It cites the Bovino case for the proposition that troubling prepetition conduct does not necessarily outweigh legitimate motivations to reorganize in determining whether a bankruptcy was filed in good faith. And that may certainly be true under the facts that were presented in the Bovino case. In Bovino, the Bankruptcy Court for the Northern District of Illinois held that the debtor had filed prior bankruptcy cases and had not fulfilled his duties as a debtor in possession. Dismissal was not appropriate, however, because the movant had failed to show that the debtor acted in bad faith and could not propose a feasible plan.

In the instant case, Eisenga and CCC's prepetition conduct rises above the troubling conduct of the debtor in the In Re Bovino case. Forging documents to induce a bank to approve a nearly $7 million loan is not simply troubling. It is egregious.

Further, CCC has provided an unreliable appraisal for the property with overly optimistic figures adjusted under

facts that are not present now with estimates that are unreliable about what may occur in the future. Unlike the debtor in In Re Bovino, the likelihood of CCC proposing a feasible plan is low.

Considering the facts and conclusions of Judge Voight in the state court action, it is indisputable that Eisenga forged the Festival lease and the SUPERVALU guaranty to induce Alliant to approve the loan. As noted by the Ninth Circuit in United States Ex. Rel. Robinson Rancheria, federal courts may take notice of proceedings in other courts both within and without the federal judicial system if those proceedings have a direct relation to the matters at issue. And I certainly find that the findings of Judge Voight have a direct relation to the proceedings before this Court.

I also take notice of the state court proceedings to find that Eisenga did, in fact, commit fraud by forging documents to get the loan. As the principal of the sole member of the debtor, his fraud should also be imputed to CCC. The totality of the circumstances here points inexorably to the conclusion that this is a bad faith bankruptcy filing by CCC.

Alliant is the only secured creditor with a debt that, as of the petition date, was $7.2 million. There is only one other creditor who is owed approximately $161,000 in a disputed general unsecured claim. The sole asset that is owned by CCC is the subject of the state court proceeding and of the

subsequently conducted state court sheriff's sale. The petition here was filed just hours before confirmation of that sale.

The property is currently not generating any income. It does generate, albeit not substantial, ongoing expenses that include real estate taxes, insurance and other related maintenance. The plan of reorganization in this case, based on the testimony, depends on the ability to either find a tenant for the vacant property who is likely not to pay rent for two years or, absent such a tenant, to then surrender the property and to have a valuation of the deficiency claim at some point in time after the confirmation of a plan.

Alliant has not received any payments since November of 2018. The property is currently vacant and has been since May of 2019. In the approximate year before the filing of this bankruptcy, the property, as noted then, was vacant. Neither the debtor nor Alliant made any efforts, based on the record, to find a tenant. While they were not required to do so, had the debtor truly intended to try and maximize value in the three-month redemption period or in the period of time since, it is reasonable that the debtor may have explored such possibility. But that's a matter for a different day and a different time.

CCC has not met its burden of establishing unusual -- the unusual circumstance exception under 1112(b)(2). While it

argues that the circumstances surrounding a prospective sale justify unusual circumstances, and it believes that a sale in the course of the proceeding or the finding of a tenant and then the surrender of the property subject to a lease would ultimately benefit, it suggests, all parties involved, it is clear that the estimated values asserted by the debtor are substantially overstated. It is -- there is no credible evidence of the likelihood of a tenant. And, finally, that the sole purpose would be to benefit Mr. Eisenga.

CCC filed its Chapter 11 plan making the various arguments described, and the primary objective was to lease the property, not to sell it. In order to support an inflated valuation for the purpose of demonstrating or attempting to demonstrate the reasonable likelihood that within a reasonable period of time, a plan might be confirmed, was, again, solely for the benefit of Mr. Eisenga and not designed to benefit the creditors or the estate.

The Court notes, of course, that there was discussion with respect to the Shopko property which is adjacent to CCC's property. It is roughly the same size as the CCC property, but it is of a different nature, character and improvements. I do note, however, that it has been vacant and on the market for over a year. The list price was recently reduced. While the reduced list price does not establish or -- is it indicative because of differences in the nature of the property of the

actual value of the CCC property, it is an indication and further support to the conclusion that the real estate market where this property is located is not as rosy as might be suggested by CCC and, further, that the value of Mr. DeClark is unreliable, unrealistic and vastly overstated.

Ultimately, CCC has failed to specifically identify any unusual circumstances that would establish that dismissal is not in the best interest of the creditors and the estate. This case involves no conditions that are not common in most Chapter 11 cases. The circumstances here, in fact, in some respects are all too common in Chapter 11 single-asset real estate cases.

There is a secured creditor who obtained a state court foreclosure and a debtor who hopes to sell or otherwise dispose of its assets at a higher value through the bankruptcy court proceedings than through a foreclosure sale. Nor is it uncommon to have a property like this remain vacant for a long period of time, especially considering the general decline of retail businesses around the country for the past few years.

However, this case is different from most single-asset real estate cases in regard to an unusual circumstance in this case. It is certainly unusual to have a debtor who has committed a major fraud seek the protections afforded under the Bankruptcy Code for itself and for the benefit of what I will call an insider, meaning the sole owner

of the sole owner of the debtor. This is not the unusual circumstance contemplated by the Code or by Congress under Section 1112(b)(2).

Even if the Court were to find that CCC's proposed inflated valuation and plan of reorganization might be realistic or feasible, there is still the issue of whether CCC and, indirectly, Mr. Eisenga deserve to reap the benefits of the Bankruptcy Code. The goal of our bankruptcy system is to allow honest but unfortunate debtors a fresh start. CCC's financial and legal troubles, however self-inflicted they may be, are certainly unfortunate. But the debtor and, more importantly, Mr. Eisenga are far from honest but unfortunate debtors.

Alliant has proved CCC's fraud by a preponderance of the evidence. CCC does not dispute, much less refute the fraud allegations. Rather, it simply seeks to have the Court view the totality of circumstances to find that, because the fraud took place prepetition, it has now been a model debtor since the petition date and that that fraud should be ignored.

But how can the Court view the totality of the circumstances and, at the same time, ignore the egregious conduct of the debtor and its principal and the principal of its principal that induced Alliant to approve a nearly $7 million loan? That is simply impossible and unrealistic and unreasonable.

As the Seventh Circuit explained in In Re Love, a court's good faith inquiry is both subjective and objective. It is both objective evidence of a fundamentally unfair result and subjective evidence that a debtor filed a petition for a fundamentally unfair purpose that was not in line with the spirit of the Bankruptcy Code, and those are relevant to the good faith inquiry.

In Clear Blue Water vs. Oyster Bay, the District Court for the Eastern District of New York affirmed dismissal by a bankruptcy court of a Chapter 11 for bad faith under 1112(b). The debtor in that case submitted a fraudulent -- submitted fraudulent mortgage applications, and several individuals were ultimately indicted for forging such documents. The district court held that the bankruptcy court's subjective and objective inquiry into whether there had been an abuse of the provision's purpose or spirit of the Code upheld and supported the bankruptcy court's dismissal.

Much like the debtor in that case, CCC and Eisenga have come to this court with unclean hands. Congress surely did not intend for the Code to protect such debtors. Allowing this case to continue would certainly be unfair to Alliant who was clearly defrauded and has had to engage in extensive legal actions for over a year. Moreover, CCC, as noted, was not an honest but unfortunate debtor, and any attempts to reorganize under the protections of the bankruptcy system are certainly

not in lie in this case with the spirit of the Code.

As noted, cause is defined by a non-exhaustive list of 16 factors enumerated in 1112(b)(4). Courts may dismiss a case for cause if there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

And so, as noted, the Court's inquiry here is two-fold: looking at CCC's track record to determine if it is suffering losses or making gains under those provisions and whether rehabilitation is likely given the evidence presented. Alliant has met its burden to establish cause for dismissal under 1112(b)(4)(A) by a preponderance of the evidence.

There is, albeit it not large in amount each month, a continuing loss, and there does not appear to be evidence of a reasonable likelihood of rehabilitation within a reasonable time. The property is vacant. Has been since May of 2019. Does not generate any income. All of the expenses have been paid by the receiver who has then, in turn, had funds advanced by Alliant. Negative cash flow is obvious and apparent in this case unless there is a capital infusion or contribution, which has not yet occurred, by the sole member/owner of the debtor. Thus, there are continuing losses in this case.

There is no evidence in the record that would support a finding of a reasonable likelihood of rehabilitation within a reasonable period of time. There is speculation that a tenant

might be found for the property and that, if a tenant is found, the tenant might pay its own operating expenses including real estate taxes but that it is probable such a tenant would expect to occupy the tenant rent free for up to two years. It is suggested that if such a tenant is found, the property would then be surrendered, returned, quit claimed to Alliant subject to such a lease.

Those are assumptions that form the only basis for the suggestion that there might be a, quote/unquote, "stabilized value" of the property at some point in time. All of that is purely speculative. Further, any proposed plan based on the testimony would be designed for the purpose of maximizing the value in order to minimize the amount of liability under a personal guaranty and then to extend payments over a period of time that are calculated beyond the effective date of any plan, anticipating that if such a tenant could be found there would be a minimal -- no, there would be a substantial amount credited against the Alliant debt.

Courts require that a debtor do more than manifest unsubstantiated hopes for a successful reorganization. A debtor lacks a reasonable likelihood of rehabilitation if its only source of income -- and it's not income here at all, it's really the only source of a, quote/unquote, "credit" about a valuation of a property that is to be surrendered -- is speculative.

Under an alternative scenario, the debtor suggests that if no tenant can be found, then the Court should use an as-is market value that would be credited against the secured claim of a -- Alliant in order to determine its deficiency claim. That dollar amount is $4.7 million based on the assumptions made by Mr. Gary DeClark. As noted for many, many reasons, the conclusions and opinions of Mr. DeClark are not credible and do not sustain such a finding.

However, if they did, and assuming there is no increase in the debt that was owed on the petition date of $7.2 million, it would leave a deficiency of $2.5 million owed to Alliant. And there is absolutely no evidence in the record of any ability to fund or pay $2.5 million. Simple mathematics indicates that at a million dollars at 3.75 percent interest, the interest that accrues would be more than $3,000 per month.

The defects in the comparable properties, which included properties in far more urban areas as previously noted, the vacancy rate testified to with respect to the area or portion of Columbus, the charts that were presented for a retail market analysis for Columbia County indicating rental rate trends since the end of 2015 all demonstrated a downward trend through the end of 2019. Any plan in this case is heavily dependent on unrealistic assumptions including finding a future tenant. There is no evidence that First American Properties would be able to contribute more to fund the

deficiency.

And I will, at this point, reference the amended plan that was filed. It was suggested this morning that the Court took judicial notice of that plan and disclosure statement and that attached to them was income and balance sheet information with respect to First American and its holdings.

Taking judicial notice of the fact that something was filed is not the equivalent of establishing the truth of the contents of those documents. It does not establish from a factual standpoint that, in fact, First American has significant cash flow to fund a plan.

Were the Court to consider those attachments, they would have been subject to cross-examination. They would have been subject to substantial inquiry. It would have been the case that there would have been an opportunity to inquire about other demands on what at least facially would appear to be a positive cash flow. Similarly, they would have been subject to substantial cross-examination and inquiry about what impact the significant apparent negative net worth of First American would have on that cash flow.

Thus, although there are documents that were filed and, as noted, the proposals therein are, as is not unusual in a Chapter 11, a starting place for a proposal that may end up being revised through negotiation in an ultimate plan, they are nothing more than evidence that the debtor has filed something.

I cannot rely on the truth of anything either in the balance sheet, which appears to show a significant net -- a significant net -- negative net worth or that appears to show that there may be some positive cash flow.

The issue, thus, of rehabilitation for the purposes of 1112(b)(4)(A) is not a technical one of whether the debtor can confirm a plan but, rather, whether the debtor's business prospects justify the continuance of the reorganization effort. Considering all of the facts and circumstances of this case, CCC's business prospects do not justify continuance of its reorganization efforts in this Chapter 11 case. It has not met its burden of establishing, as noted, unusual circumstances exception under 1112(b)(2), and this Court is not bound to clog its docket with visionary or impracticable schemes of resuscitation, particularly where they are aimed principally, if not solely, at benefitting the insider of the sole insider of the debtor.

This Court finds there is a -- there is an absence of a reasonable likelihood of rehabilitation or of confirmation of any plan of reorganization within a reasonable period of time. This Court dismisses the case and finds that any other outcome would be inequitable and inappropriate under the terms and provisions of the Code.

I do find under the facts and circumstances, finally, that the appointment of a Chapter 11 trustee or conversion is

not appropriate in this case. There is no positive net worth to be administered by a trustee, either Chapter 7 or 11 in the case. There is no cash flow that would address administrative expenses of the trustee. And, accordingly, it is not in the best interests of the estate or the creditor for the case to be converted. Instead, the appropriate outcome is dismissal.

Will you prepare an order, Mr. DiCastri?

MR. DICASTRI: Yes, I will, Your Honor. Thank you.

THE COURT: Thank you. That concludes this hearing. We're adjourned.

(Proceedings concluded)

* * * * *

**C E R T I F I C A T I O N**

I, Liesl Springer, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

LIESL SPRINGER, AAERT NO. 685 DATE: July 23, 2020
ACCESS TRANSCRIPTS, LLC

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

ALICIA JARRETT, AAERT NO. 428 DATE: July 29, 2020
ACCESS TRANSCRIPTS, LLC